Danny C. **Charfauros**, et al.,
Plaintiff/Appellants,
**v.**
**Board of Elections**, et al.,
Defendants/Appellees.
Appeal No. 97-023 & 97-027
(consolidated)
Civil Action No. 95-1106
November 27, 1998

Argued and Submitted on June 25, 1998

Counsel for appellant: John M. Chambers, Saipan.

Counsel for appellee: Robert Goldberg, Office of Attorney General, Saipan.

BEFORE: ATALIG, Justice Pro Tem, MACK, Special Judge, and WISEMAN, Special Judge.

WISEMAN, Special Judge, delivered the opinion of the Court.
ATALIG, Justice Pro Tem, wrote a separate opinion concurring in part and dissenting in part.
MACK, Special Judge, joined the opinion of the Court and wrote a separate opinion concurring.

WISEMAN, Special Judge:

## I.

### Introduction

¶1 This case requires us to determine whether the Superior Court erred when it granted summary judgement to defendants, the Commonwealth Board of Elections and its individual members, dismissing: (1) a claim for intentional infliction of emotional distress, (2) claims under 42 U.S.C. § 1983 for violation of constitutional rights, and (3) determining that the members of the Board of Elections were entitled to qualified immunity for their acts of declaring certain persons ineligible to vote in the November 5, 1995, general election on Rota.

This case follows an earlier civil action brought to challenge the results of the November 4, 1995, election on Rota. *Taitano v. Mundo,* Civil Action No. 95-1082(B) (NMI Super.Ct. April 11, 1996). Both causes of action arose out of facts demonstrating that the Board of Election wrongfully disqualified certain registered persons from voting. The judgment in *Taitano v. Mundo, supra,* allowed four persons to vote who had been disqualified.

Three of those four brought this present action seeking damages against members of the Board of Elections who disqualified them. Specifically, plaintiffs alleged that the acts of the Board of Election and its individual members wrongfully deprived them of constitutionally-protected rights, that they are entitled to relief under 42 U.S.C. § 1983 as a consequence, and that the acts complained of constitute a cause of action for the common law tort of intentional infliction of emotional distress. Plaintiffs appeal from the grant of summary judgment in favor of defendants on all claims.

¶2 In the "Order Denying Partial Summary Judgment and Granting Summary Judgment," *Charfauros v. Board of Elections,* p. 1, Civil Action No. 96-1106 ( NMI Super. Ct., May 29, 1997) ("*Charfauros* Order"), ER, pp. 36-42, the trial court specifically adopted the facts set forth in its "Order" in the related case of *Taitano v. Mundo,* Civil Action No. 95-1082(B) (NMI Super. Ct. April 11, 1996) ("*Taitano* Order"), ER, pp. 89-99, for purposes of ruling on the motion for summary judgment at issue in this appeal.

## II.

### Facts

¶3 The Board of Elections was notified by representatives from both the Republican and Democratic parties in Rota that each party challenged the qualifications of certain persons to vote in the 1995 general election on Rota. *Taitano* Order, p. 2, ER, p. 90. The Board of Elections, "for the first time, applied a new procedure to hear and adjudicate challenges to voter residency status." *Id.* This "new procedure" was highly suspect and improper.

¶4 On October 16, 1995, Herman A. Apatang, President of the Democratic Party of Rota, sent, on Democratic Party of Rota letterhead, a letter to the chairman and members of the Board of Elections. This letter notified the Board of Elections that the Democratic Party of Rota ("Democratic Party") challenged the qualifications to vote of twenty-two individuals who had registered to vote. All but two of these individuals were challenged as ineligible to vote on the basis they did not have bona fide residence on Rota. This case only involves three of the twenty persons challenged on the basis they did not meet the residency requirement. Twice, the letter specifically requested that the Board of Elections conduct administrative hearings on the challenges "prior to election day." The election was scheduled to be held on November 4, 1995, fifteen working days from the date of the letter.

¶5 Challenges to voter qualifications were also lodged with the Board of Elections by the Republican Party of Rota, but no documents stating those challenges are of record in this case.

190

¶6 The portion of the letter from the Democratic Party identifying the people challenged on the basis of residency contains three columns. The first column listed each person's name, the second column listed each person's voter registration affidavit number, and the last column, entitled "Currently Residing," listed five different places where each of the twenty alleged non-residents were living. These were identified as either Guam, Saipan, Arizona, California or U.S. No street address or post office box number was provided. Only a broad geographical description such as "Guam," or "California" was indicated.

¶7 Using the "new procedure" for determining voter disqualifications, the Board of Elections held hearings on October 30, 1995, five days before the November 4 election, on the challenges lodged by the representative of the Democratic party. Deposition of Miguel M. Sablan, ER, p. 67. The record reveals that only Democratic party challenges were scheduled for hearing on October 30, 1995. *Id.* No voter challenged by the Republican party was scheduled for hearing on that date. *Id.*

¶8 Prior to the hearings on October 30, 1995, notices were sent out to those voters challenged at the Rota address each person had listed on their voter registration form. ER, p. 3. Plaintiff Charfauros testified that he did not receive his notice until two days before the scheduled hearing. *Taitano* Order, p. 2, ER, p. 90. Plaintiffs Atalig and Aldan testified that they did not even hear of the challenge made to their eligibility until after the hearing before the Board of Elections had already been held. ER, p. 54, 59.

¶9 At the hearing on the motion for summary judgment at issue here, the trial court judge relied on his recollection of the testimony in the *Taitano* case to comment on claims by plaintiffs Atalig and Aldan that they had not received notice of the hearing on the challenge to their residency. ER, p. 3. The trial court judge recalled that at least some of the plaintiffs in the *Taitano* case (but not Charfauros) had not received their notice of the hearing because they lived on Saipan, and the notice was sent to their address on Rota. In these cases, someone on Rota had to pick up the mailed notice at the Rota post box listed and then forward it to Saipan causing a delay in receipt. *Id.* The trial court went on to say,

> [T]he Board [of Elections] can't be held responsible for the fact that there's a problem with the delivery of the mail because the fact these people put their address as Rota, but in fact they're physically residing on Saipan. Because I know that at least two of them said they were working, I think Mr. Atalig said he was working for I think the Department of the Labor and Immigration and that he was working and residing here on Saipan.

ER, p. 3-4.

¶10 Thus, the trial court concluded that plaintiffs had not set forth "concrete" factual allegations supporting the claim that they had not received adequate notice of the hearing. ER, p. 4.

¶11 The Chairman of the Board of Election, Miguel M. Sablan, described why the Democratic party challenges were separated from the Republican party challenges and heard first. He said that the Democratic party challenges were "pretty specific" while those of the Republican party were not. The Democratic party challenges recited that the challenged voter was not a resident of Rota *and* recited a place where "this particular person is now staying" or "something in the line of . . . reasoning for their challenge." Deposition of Miguel M. Sablan, ER, p. 68. The Chairman went on to explain the failures of the Republican party challenges as follows:

> Whereas the challenge from the Republican party, if I'm not mistaken, was only the mentioning of not being a resident of Rota and that's it. Period. . . . Without any indication whether they are staying on Saipan or in Tinian or in Alamagan or in the States for that matter. The reason why we required that was because we want to get in contact with ah – these people who are being challenged and advise them in time that you have been challenged and that if you wish to – to defend your application or the registration, please appear. The – that's the reason why we want to know ah – we want to be little bit more specific on the challenge so that we could give everybody the opportunity to answer the challenge.

*Id.*

¶12 For these stated reasons, the Board of Election decided to hear the Democratic party challenges before the election, and delay the Republican party challenges until after the election. The Board of Elections thus created two classes of challenged voters and was aware at all times that only Democratic party challenges were considered at the October 30th hearing.

¶13 Clearly this explanation does not comport with the record before this Court about the actual process employed by the Board of Elections. First, no "address" was provided by the Democratic Party where each challenged person could be reached to notify them of the hearing upon their challenge. The broad geographical designation that someone lived in "Guam," "California," or the "U.S." would never have permitted the Board of Elections to either mail notice or serve notice of such a hearing. Second, the Board did not use the "address" somewhere outside Rota to contact each challenged voter. Instead, the Board mailed notices of the hearing to each challenged

voter's Rota address. While an attempt was made to draw distinctions between the challenges made by the Democratic Party and those made by the Republican Party, in practice the distinctions were not employed in any meaningful way. Those voters challenged by the Republican party on the basis "of not being a resident of Rota and that's it . . . Period," could have had notices of a hearing on their challenges mailed to their listed Rota address in the same manner as the Democratic party challenges were mailed.

¶14    Plaintiff Danny Charfauros received notice of the hearing on October 30, but he did not attend because he "was too busy working to attend." *Taitano* Order, p. 2, ER, p. 90. The two other plaintiffs to this cause of action, John Andrew Atalig and Gina M. Aldan, both "testified that although they were represented at the October 30, 1995, hearing by [Jim] Atalig, they never authorized the representation." *Id.*

¶15    At the disqualification hearings, the Board considered the letter from the Democratic Party setting forth the challenges made on behalf of the Democratic party.[1] The Board also heard the testimony of Democratic Party President Herman A. Apatang concerning what the trial court derisively referred to as Apatang's "research" into each challenged voter's residency. ER, p. 90. The Superior Court described the Board's review and Apatang's testimony as follows:

> Taking the testimony presented at the . . . election contest hearing in its entirety, it is clear to the Court that the Board relied almost exclusively on the "research" of Herman Apatang in making its determinations concerning voter eligibility, and that such "research" amounted to little more than reliance on who Mr. Apatang knew personally or recalled seeing on Rota in the weeks preceding the November election. Not only was Mr. Apatang's research insubstantial, but it was, in several cases, demonstrated to be incorrect.

*Taitano* Order, p. 9, ER, p. 97.

¶16    The "insubstantial" and "incorrect" nature of Mr. Apatang's "research" is clearly reflected in the record. Regarding plaintiff Charfauros, Mr. Apatang testified that,

> [Apatang] had not seen him [Charfauros] on Rota, that he had a small family name and that the family name was "not in Mr. Apatang's family roots."

---

[1] No other documents giving rise to, or otherwise documenting the voters' eligibility or residency challenges are of record before this Court.

*Taitano* Order, p. 6, ER p. 94 (*quoting from* Herman Apatang's trial testimony in *Taitano*).

¶17    Senator Paul Manglona testified at the hearing on behalf of plaintiff Charfauros even though Charfauros was not present himself. Senator Manglona testified that Charfauros "was living on Rota and managing his [Charfauros'] father's business on the island." *Taitano* Order, p. 6, ER p. 94. In spite of this conflicting testimony at the hearing, the Board of Elections relied on Herman Apatang's testimony exclusively to determine that Charfauros was ineligible to vote. *Id.*

¶18    Regarding plaintiff Atalig, the Court quoted Mr. Apatang's testimony as follows:

> [Apatang] had not seen Mr. Atalig on Rota and did not know when he [Mr. Atalig] returned to Rota prior to the election. [Mr. Apatang] said he told the Board that Mr. Atalig was employed by Freedom Air and was living on Guam.

*Id.*

¶19    Regarding plaintiff Aldan, the *Taitano* order recites the following Apatang testimony:

> Mr. Apatang testified that he does not know Ms. Aldan personally, but knows what she looks like and through his investigation found out that she is not residing or employed on Rota and is staying with her mother on Guam. Mr. Apatang told the Court that his research included an inquiry whether the contested voter owned a Rota homestead. However, when asked whether Mr. Apatang investigated Mr. Atalig's and Ms. Aldan's homestead ownership, he replied the he "had not gotten that far."

*Id.* at p. 7, ER, p. 95.

¶20    At the hearing, Jim Atalig, brother of plaintiff Atalig, spoke on behalf of both plaintiffs Atalig and Aldan, who were not present. *Id.* Jim Atalig testified at the hearing that his brother and Ms. Aldan both "lived with Mr. Atalig's family in Sinapalo," Rota. *Id.* Again, in spite of this conflicting testimony, the Board of Elections decided to believe the testimony of Herman Apatang completely, and disbelieve the testimony of Jim Atalig completely - despite the fact that Jim Atalig's testimony was facially based on personal knowledge and at least part of Herman Apatang's testimony was not. The Chairman of the Board of Elections testified in the *Taitano* trial that, "the Board based its decision to deny Mr. Atalig and Ms. Aldan the right to vote based on [Herman Apatang's] testimony alone." *Id.* Clearly this portion of the record also destroys the other rationale for creating two classes of challenged voters: that the Democratic party challenges were more "specific" than the Republican party challenges. No part

of Herman Apatang's testimony concerning any of the three plaintiffs can qualify as "specific" as to any fact at all. The personal knowledge reflected in Apatang's testimony is based solely upon who he had seen, or not seen, in his daily wanderings around Rota. In addition, the record does not reflect that any of Apatang's testimony was taken under oath, or that any sworn declarations were ever employed. The most "specific" and salient facts to be seen from the testimony and the surrounding circumstances was that Apatang, as President of the Democrat Party, challenged the residency of certain people on the basis of Apatang's inadequate and incorrect "research," and the Board of Elections decided to believe Apatang's testimony in spite of directly contradictory testimony, and in spite of each voter's sworn affidavit of residency.

¶21    The trial court found that the Board considered both Herman Apatang's testimony and the legal criteria for voting set forth in 1 CMC §§ 6202 - 6204, and other guidelines set forth in 1 CMC § 6205(b)(1) when deciding to disqualify the plaintiffs from voting. *Taitano* Order, p. 2, ER, p. 90. It is not clear, however, the extent to which legal criteria were used, since the only question in the case of each challenged voter was residency, and on that question the record shows the Board of Election deferred to Apatang's "research" and opinion.

¶22    A decision to disqualify the three plaintiffs in this case was apparently not reached until November 2, 1995, when Juan M. Diaz, Executive Director of the Board of Elections, issued a memo. The Board of Elections employed no formal procedure to advise the several disqualified voters who were parties to the *Taitano* action they would not be allowed to vote. The Board of Elections never published a revised list of voters that resulted from the October 30, 1995, hearings on the challenges. *Taitano* Order, p. 3, ER, p. 91. Two of the five voters who initially brought suit in *Taitano* were advised they could not vote by Rota Senator Paul Manglona (who had seen an unpublished list of voters). *Id.* Plaintiff Charfauros later testified he learned of his disqualification when he was denied an absentee ballot. *Id.*, (*See also*, Deposition of Danny C. Charfauros, ER, p. 44-45). Two voters who did receive notice got it by hand delivered letters advising them that their voter registrations had been transferred to Saipan. *Id.*

¶23    After the initial decision to disqualify these voters had been reached by the Board of Election there was some confusion, and apparently a reversal of that portion of the Board's decision that the disqualified persons could not vote on November 4. An attempt was made to contact an attorney for some of the voters on the morning of the election to advise him that his clients would be allowed to vote and their disqualification finally resolved after the election. ER, p. 27. This attempt was not successful and those voters did not vote. *Taitano* Order, p. 3, ER, p. 91.

¶24    Later, on November 7, 1995, two days after the election had already been held, some of these voters, including the plaintiffs here, were sent letters advising them that they would be allowed to vote in the election that had already been held two days previously on November 5, 1995. *Id.*, *See also*, ER, pp. 74-76. It was later claimed by the chairman of the Board of Elections that these letters were mis-dated, and should have been dated November 4, 1995. *See* Deposition of Miguel M. Sablan, Supp. ER, p. 25. But this assertion was specifically rebutted by the deposition testimony of the Executive Director of the Board of Elections. *See* Deposition of Juan M. Diaz, ER, p. 73. Concerning these notices, Mr. Diaz testified as follows: "Ah, this particular one dated November 7, that's the date that we sent it out . . ." *Id.* The record does not reveal why the Board of Elections engaged in the nonsense of notifying disqualified voters they would be allowed to vote in an election already held.

¶25    In the *Taitano* decision the Superior Court summarized the "new procedure" for deciding voter eligibility challenges employed by the Board of Elections and at issue here as "unprecedented,""unpublished," and "egregious." *Taitano* Order, p. 10, ER, p. 98. Specifically, the "new procedure" denied the challenged voters any opportunity to appeal the Board's determination that they were ineligible to vote. *Id.* It is clear to this Court from the record that reasonable Election Board members using common sense and reasonable standards would never have employed this "new procedure" under such circumstances, or in the manner it was employed.

### III.

### Proceedings Below

¶26    The trial court found that plaintiffs had failed to allege facts in opposition to defendants' motion for summary judgment sufficient to make out a claim for intentional infliction of emotional distress. The trial court also held that the facts alleged could not withstand challenge by defendants that they were entitled to qualified immunity from the charges made under 42 U.S.C. § 1983.[2]

---

[2]  42 U.S.C. §1983, in relevant part, is as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia. subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper

¶27 With respect to the claim of intentional infliction of emotional distress, the trial court found that the conduct of defendants was not sufficiently outrageous to state a claim as a matter of law, and that plaintiffs had not alleged or supported sufficient injury to state a claim:

> Plaintiffs offer no evidence to prove that the conduct was sufficiently outrageous and extreme to satisfy the first element of the tort.
>
> In addition, plaintiffs fail to establish by medical or other evidence, that severe emotional distress occurred. Indeed, plaintiffs concede, in response to defendant's interrogatories, that they received no medical treatment . . . and did not suffer any physical injuries as the result of defendants' actions. . . . Instead, Plaintiffs (sic Plaintiffs') claim that the publicity generated by the *Taitano v. Mundo* election challenge and this lawsuit caused strain on their personal relationships and negatively affected their business relationships in their community. . . . Such allegations are insufficient to prove the element of severity. *See, e.g. Thomas,* 877 F.2d 1435.

*Charfauros* Order, p. 3, ER, p. 38 (*citing Thomas v. Douglas,* 877 F.2d 1428, 1435 (9th Cir. 1989).

The trial court also dismissed those portions of the complaint[3] alleging a cause of action under 42 U.S.C. § 1983 for violation of rights guaranteed to plaintiffs by the Commonwealth Constitution. The court found alleged violations of the Commonwealth Constitution are not remediable under 42 U.S.C. § 1983. *Charfauros* Order, p. 4, ER, p. 39, *citing Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3112, 82 L.Ed.2d 139 (1984); *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 73 L.Ed.2d 396 (1987). Accordingly, the court dismissed those claims alleging violation of plaintiffs' rights to vote secured by Article VII, § 1,[4] and their rights to equal protection under Article I, § 6 of the Commonwealth Constitution.[5] As a consequence, only one claim actionable under 42 U.S.C. § 1983 remained: whether plaintiffs were denied the right to equal protection as guaranteed by the 14th Amendment to the United States Constitution. *Charfauros* Order, p. 3, ER, p 4. The complaint specifically alleged violation of plaintiffs' rights to "equal protection of the law under the Fourteenth Amendment of the United States Constitution." Complaint, ¶57(c), Supp. ER, p. 4.

¶28 The trial court did not reach the issue of whether plaintiffs' equal protection rights were violated. Instead, the trial court addressed the defenses raised by defendants. First, the trial court held that those portions of the complaint alleging liability on the part of the Board of Elections itself, and those portions of the complaint alleging violation of rights by the members of the Board of Elections acting in their official capacity were barred because neither the Commonwealth, its agencies, nor its officials acting in their official capacities are deemed "persons" under precedent interpreting 42 U.S.C. § 1983. *Id., citing Will v. Michigan Dept. of State Police,* 491 U.S. 58, 68-70, 109 S.Ct. 2304, 2310-2311, 105 L.Ed.2d 45 (1989), *Ngiraingas v. Sanchez,* 495 U.S. 182, 192, 110 S.Ct. 1737, 1738, 109 L.Ed.2d 163 (1990), *DeNieva v. Reyes,* 966 F.2d 480, 483 (9th Cir. 1992).[6]

---

proceeding for redress. . .

[3] Plaintiffs/appellants failed to include the complaint filed in this matter within the excerpts of record. Defendants included a portion of the complaint in their supplemental excerpts of record.

[4] Article VII, § 1, of the Commonwealth Constitution, entitled Qualifications of Voters, is as follows:

> A person is eligible to vote who, on the date of election, is eighteen years of age or older, is domiciled in the Commonwealth, is a resident of the Commonwealth, and has resided in the Commonwealth for a period of time provided by law, is not serving a sentence for a felony, and has not been found by a court to be of unsound mind, and is either a citizen or national of the United States. The legislature may require that persons eligible to vote be citizens of the United States.

[5] Article I, § 6 of the Commonwealth Constitution, entitled Equal Protection, is as follows:

> No person shall be denied the equal protection of the laws. No person shall be denied the enjoyment of civil rights or be discriminated against in the exercise thereof on account of race, color, religion, ancestry or sex.

[6] The distinction of the capacity of government officials refers to their amenability to suit under § 1983. *Hafer v. Melo, supra.* Commonwealth officials acting in their official capacity are deemed instruments of the CNMI and are, therefore, not proper parties to an action for money damages because the CNMI itself is not a "person" within the meaning of § 1983. *DeNieva,* 483 F.2d at 483. They remain liable for monetary relief in their individual capacities. *Id.* Further, in their official capacities, they are proper parties to a suit for prospective equitable relief under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the state." *DeNeiva,* 966 F.2d. at 483 n. 3 (*citation omitted*); "Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America," § 502(a)(2), 90 Stat. 263, *reprinted at* 48 U.S.C. §1681; *Guam Society of*

¶29 The trial court next turned to the question whether the members of the Board of Elections, acting in their *individual capacities* could be liable as a matter of law under 42 U.S.C. § 1983. The court found that Commonwealth officials acting in their individual or personal capacities could be liable under § 1983. *Charfauros* Order, p. 4, ER, p. 39, *citing DeNieva, supra,* and *Hafer v. Melo,* 502 U.S. 20, 31, 112 S.Ct. 358, 365, 116 L.Ed.2d 301 (1991).

¶30 The trial court finally turned to the defenses available to defendants. The members of the Board of Elections, acting in their individual capacities, asserted qualified immunity.[7] The court held that "the procedure for resolving voter challenges was not 'clearly established' at the time the Board attempted to resolve the November 4, 195, Rota election challenges." A Board member, therefore, "could have believed that the creation of two classes of challenged voters was reasonable." Accordingly the court held that defendants were entitled to qualified immunity. *Charfauros Order,* p. 7, ER, p. 42.

## IV.

### Jurisdiction and Issues Presented

¶31 ■ This Court has jurisdiction over the issues presented pursuant to Article IV, § 3 of the Commonwealth Constitution.

---

*Obstetricians and Gynecologists v. Ada,* 962 F.2d 1366, 1371 (9th Cir.), *cert. denied,* 506 U.S. 1011 (1992).

[7] It is not clear from the record before this Court whether defendants asserted this defense in their answer to the complaint or raised it for the first time at the motion for summary judgment. Plaintiffs appear to allege the defendants did not plead this defense in their answer. *See* Appellant's Brief, p. 7, ("Qualified immunity is an affirmative defense to a § 1983 action, so that the defendants have the burden of pleading and proving their defense. *Mahers v. Harper,* 12 F.3d 783 (8th Cir. 1993). *See also, Gasho v. U.S.,* 39 F.3d 1420 (9th Cir. 1994), *cert. denied,* 115 S.Ct. 2582 (1994)"). However, plaintiffs did not include defendants' answer to the complaint in the excerpt of record filed for this appeal, and thus have not provided a basis to review any claim that defendants did not properly plead it. Accordingly, the issue shall not be considered. *In re Estate of Deleon Castro,* 4 N.M.I. 102, (1994).

It is counsel's responsibility to see that the record excerpts are sufficient for consideration and determination of the issues on appeal and the appellate court is under no obligation to remedy any failure of counsel to fulfill that responsibility.

*Id.,* 4 N.M.I. at 108 n.19.

¶32 Four issues are presented in the briefs for appellate review. These are (1) whether the complaint stated a cause of action that members of the Board of Elections violated the equal protection rights of the plaintiff voters, (2) whether the members of the Board of Elections may be held liable in their individual capacities under 42 U.S.C. § 1983 for such violation, (3) whether the trial court erred in holding that the members of the Board of Elections are entitled to qualified immunity for such alleged violation, and (4) whether the trial court erred in granting summary judgment on plaintiffs' claims for the tortious intentional infliction of emotional distress.

## V.

### Standards of Review

¶33 ■ Orders granting or denying summary judgment are reviewed de novo on appeal. *Rios v. Marianas Pub. Land Corp.,* 3 N.M.I. 512, 518 (1993). Summary judgment may be granted only when the court, after viewing the facts and inferences therefrom in a light most favorable to the non-moving party, finds as a matter of law that the moving party is entitled to judgment as a matter of law. *Cabrera v. Heirs of De Castro,* 1 N.M.I. 172, 176 (1990); *Rios, supra.* An order granting or denying summary judgment will be affirmed on appeal only if there are no genuine issues of material fact and the substantive law was correctly applied. *Rios, supra.* Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an essential element to the party's case. *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## VI.

### The Voting Rights Claims

#### A. The Constitutionally Protected Right to Vote

■ The United States Supreme Court has long held that the right to vote is "a fundamental political right." *Reynolds v. Sims.* 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964). The importance of this fundamental right is underscored by its function in a democratic society.

[T]he right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights.

*Id.* 377 U.S. at 562, 84 S.Ct. at 1381.

No right is more precious in every country than that of having a voice in the election of those

who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.

*Williams v. Rhodes*, 393 U.S. 23, 89 S.C.t 5, 10, 21 L.Ed.2d 24 (1968).

¶34 ■ At the same time, however, the U.S. Supreme Court has also held that states have a compelling state interest in regulating reasonable qualifications to vote. *Carrington v. Rach*, 380 U.S. 775, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965).

> Indeed the States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised. [*Citations omitted*]. In other words, the privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may deem proper, *provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution.*

*Id.* 380 U.S. at 91, 85 S.Ct. at 777.

¶35 This refrain has been repeated often by the U.S. Supreme Court. *Pope v. Williams*, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817 (1904) is an early case on the right of a state government to restrict access to the ballot. In *Pope*, the Court held that a state may validly require that voters in elections be residents of the state, and may require persons to file declarations of their intent to become citizens and residents of the state before enrolling them to vote. The *Pope* Court went on to say,

> [T]he privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as it may deem proper, *provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution.*

*Id.*, 24 S.Ct. at 575 (*Italics supplied*).

¶36 In *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), the Court, addressing a durational residency requirement, again emphasized the requirement that voter qualifications be equally applied.

> An appropriately defined and uniformly applied requirement of bona fide residents may be necessary to preserve the basic conception of political community, and therefore could withstand close constitutional scrutiny.

*Id.*, 92 S.Ct. at 1004.

¶37 Restrictions on the fundamental right to vote are subject to varying levels of review. In most cases, the Supreme Court has held that,

> In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.

*Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). *See also, Kramer v. Union Free School District*, 395 U.S. 6212, 626, 89 S.C.t 1886, 1889, 23 L.Ed.2d 583 (1969). This has led the Court to apply the strict scrutiny - compelling state interest test in a number of cases. *See Dunn*, 405 U.S. at 337, 992 S.Ct. at 1000; *Cornman*, 398 U.S. at 422, 90 S.Ct. at 1755; *Kramer*, 395 U.S. at 627, 89 S.Ct. at 1889-1990; *Williams*, 393 U.S. at 31, 89 S.Ct. at 11.

¶38 Yet, at the same time, at other times the Court has employed a balancing test that appears somewhat softer than strict scrutiny.

> The right to vote is a fundamental right and restrictions on it are subject to "strict scrutiny" but in this context "strict scrutiny" means only that judges must independently review the voting regulation or restriction. If the restriction is in fact related to important or overriding state interests, the Court will sustain that regulation or restriction.

Rotunda and Nowak, "3 TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE," 2d Ed., § 18.31 at p. 390 (1992).

¶39 As stated by the United States District Court in *Vargas v. Calabrese*, 634 F.Supp. 910, 928 (D.N.J. 1986),

> Balancing must take place and weighing the interests of the state and preventing fraudulent voting through procedures for checking for qualifications and the individual right to vote. However, there is no "litmus-paper test" the courts can apply passing upon the constitutionality of state election laws. *Storer v. Brown*, 415 U.S. at 730, 94 S.Ct. at 1279. Instead courts must engage in an analytical process, applying the standard most recently set forth in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1982):
>
> > [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the

First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justification for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiffs rights. Only after weighing all these factors is the reviewing court in position to determine whether the challenged provision is unconstitutional.

*Calabrese* at 928, *quoting from Anderson v. Celebrezze*, 460 U.S. at 789, 103 S.Ct. at 1570.

¶40 ■ The right to vote in a Commonwealth election is a fundamental right of citizenship and restrictions placed on that right are protected by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and by Article I, § 6 of the Commonwealth Constitution.

> In decision after decision, this court has made clear that citizens have a constitutionally protected right to participate in elections on equal basis with other citizens in the jurisdiction. [*Citations omitted*]. This "equal right to vote," [*citation omitted*] is not absolute; the States have the power to impose voter qualifications, and regulate access to the franchise in other ways. [*Citations omitted*]. But, as a general matter, "before that right [to vote] can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny."

*Dunn*, 405 U.S. at 336, 92 S.Ct. at 1000, *quoting from Cornman*, 398 U.S. at 422, 426, 90 S.Ct. at 1755, 1756. In 1972 the *Dunn* Court went on to say,

> [I]t is certainly clear now that a more exacting test is required for any statute that 'place[s] a condition on the exercise of the right vote.' *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972). We conclude that the challenged statute grants the right to vote some citizens denies the franchise to others, 'the court must determine whether the exclusions are *necessary* to promote a *compelling* state interest.'

*Id.,* 405 U.S. at 337, 92 S.Ct. at 1000.

¶41 Additional assurance of the equal right to vote is found from the text of Article I, § 6 of the Commonwealth Constitution itself:

> No person shall be denied the equal protection of the laws. No person shall be denied the enjoyment of civil rights or be discriminated against in the exercise thereof on account of race, color, religion, ancestry or sex.

*Id.*

¶42 The right to vote is a civil right in the Commonwealth. It is protected by Article I, § 6, *supra*. No qualified person may be denied the right to vote on unequal terms than others. [8]

### B. Qualified Immunity

¶43 ■ At the outset, we note that the Superior Court did not follow proper procedure required when the defense of qualified immunity was asserted. The first step is to determine whether a constitutional violation has, in fact, occurred. Only after that has been determined should the court go further to assess whether the right in question was "clearly established" and whether a reasonable official would have known that his acts violated the right in question. This procedural approach has been restated by the U.S. Supreme Court recently in *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 1714, 1998 L.Ed.2d 3504 (1998).

> As in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated. *See Graham v. Connor*, 490 U.S. 386, 394 (1989). . . . [T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question. *See Siegert v. Gilley*, 500 U.S. 226, 232 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all," and courts should

---

[8] Plaintiffs asserted no cause of action in the complaint for damages arising from the violation of Article I. § 6. We need not now. therefore, consider whether such an action is "appropriate" or "necessary" under RESTATEMENT (SECOND) OF TORTS § 874A.

not "assum[e], without deciding, this preliminary issue").

. . . [T]he generally sound rule of avoiding determination of constitutional issues does not readily fit the situation presented here; when liability is claimed on the basis of a constitutional violation, even a finding of qualified immunity requires some determination about the state of constitutional law at the time the [government official] acted. What is more significant is that if the policy of avoidance were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals. An immunity determination, with nothing more, provides no clear standard, constitutional or non-constitutional. In practical terms, escape from uncertainty would require the issue to arise in suit to enjoin future conduct, in an action against a municipality, or in litigating a suppression motion in a criminal proceeding; in none of these instances would qualified immunity be available to block a determination of law. [*Citation omitted*]. But these avenues would not necessarily be open, and therefore the better approach is to determine the right before determining whether it was previously established with clarity.

*Id.,* 118 S.Ct. at 1714 n.5.

¶44    The trial court found, and we have no difficulty in agreeing, that the Equal Protection Clause of the Fourteenth Amendment protects an individual's right to vote and that right was clearly established before the Board of Elections undertook the challenges made to voters by the Democratic Party of Rota.

[T]here can be no doubt at this date that "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper v. Virginia Board of Elections,* 383 U.S. 663, 665, 86 S.Ct. 1079, 1081, 126 L.Ed.2d 1699 (1966); see *Williams v. Rhodes,* 393 U.S. 23, 29, 89 S.Ct. 5, 9, 21 L.Ed.2d 24 (1968). Moreover, the right to vote, as the citizens link to his laws and government, is protective of all fundamental rights and privileges. See *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886); *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 534, 11 L.Ed.2d 481 1964). And

before that right can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny.

*Evans v. Cornman,* 398 U.S. 419, 422, 90 S.Ct. 1752, 1755, 26 L.Ed.2d. 370 (1970). *See also, Kramer v. Union Free School District,* 395 U.S. 621, 629, 89 S.Ct. 1886, 1890-91, 23 L.Ed.2d 583 (1969).

In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification. *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5,10, 21 L.Ed.2d 24 (1968). And, in this case, we must give the statute close and exacting examination. "[S]ince the right to exercise the franchise in free and on impaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims,* 377 U.S. 533, 562, 84 S.Ct. 1362,1381,12 L.Ed. 2d 506 (1964). See *Williams v. Rhodes, supra,* 393 U.S. at 31, 89 S. Ct. at 10; *Wesberry v. Sanders,* 376 U.S. 1,17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964). This careful examination is necessary because statutes distributing the franchise constitute the foundation of our representative society. Any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government. . . . . No less rigid an examination is applicable to statutes *denying* the franchise to citizens who are otherwise qualified by residents and age.

*Kramer,* 395 U.S. at 626, 89 S.Ct. at 1889; *see also Cornman,* 398 U.S. at 422, 90 S.Ct. at 1755.

¶45    ▮ We find that the same analysis applies to a *procedure* used to disqualify or otherwise deny the voting franchise to citizens. If the procedure used to disqualify voters discriminates against certain groups of voters, the basis of that discrimination is subject to strict scrutiny. Analytically, there is no reason to distinguish between the substantive law used or the procedure used to discriminate against and disenfranchise voters.

It is important to remember that the Court's rulings concerning the right to vote have come in terms of equal protection. The decision to find the right to vote to be constitutionally

"fundamental" and subject to a meaningful form of judicial review may best be described as a substantive due process decision because it is based on an analysis of the importance of that right and it restricts the substance of legislation [and administrative procedures] regulating the exercise of the electoral franchise.

R.Rotunda and J. Nowak, 3 TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE, 2d Ed., §18.31 at p. 392 (1992) (hereinafter TREATISE ON CONSTITUTIONAL LAW).

¶46   Therefore, the procedure used by the Board of Elections in this case should be strictly scrutinized to determine if it was *necessary* to protect a *compelling* interest on the part of the Board of Elections to disqualify registered voters who were not bona fide residents of Rota.

> Classifications that burden the right to vote can be upheld only if they are necessary to advance a compelling governmental interest. [*Citation omitted*]. Moreover, the classification must be closely tailored to effectuate only that interest . *Zablocki v. Redhail*, 34 U.S. 374, 388, 98 S.Ct. 637, 682, 54 L.Ed.2d 618 (1978).

*Olagues v. Russoniello*, 7997 F.2d 1511, 1521-22 (9th Cir 1986) (*en banc*) ("Olagues II").

> [S]trict scrutiny analysis in this area may only require the [government] to demonstrate that its regulation [of voter eligibility] is narrowly tailored to promote an interest that is significant enough to outweigh any incidental restriction of the right to vote . . . Laws that regulate the electoral system to promote substantial state interests in the conduct of efficient and honest elections need to be examined on a case-by-case basis.

TREATISE ON CONSTITUTIONAL LAW, *supra*, at p. 390-91.

¶47   Inquiry as to the necessity of the Board of Elections' procedure is answered by the acts of the Board with respect to those persons challenged by the Republican Party. Hearings to determine whether registered voters challenged by the Republican Party were eligible to vote in the 1995 Rota election were held *after* the election. The reasons for this do not appear on the record. There are, however, definite and clear considerations the Board of Elections should have weighed. The short time frame between when the challenges were filed and when the election was held should have been one factor. The ability of these voters to file and be heard upon an appropriate appeal of a determination of ineligibility should have been another factor. Finally, the avoidance of a chilling effect on the right to vote on the part of persons challenged should have been another factor. It is apparent from the record that the Members of the Board of Elections failed to consider any of these factors when deciding to rush to hear the challenges made by the Democratic Party of Rota.

¶48   ■   We hold that while the interest of the Commonwealth government and Board of Elections in restricting access to the ballot to only those persons who meet the bona fide residency requirement is a compelling one, the *means* used in this case were not *necessary*. Stated differently, the means employed were not sufficiently or narrowly tailored to outweigh plaintiffs' interests in voting. Accordingly, we hold that the Board of Elections violated the plaintiffs' right to Equal Protection and equal access to the ballot.[9]

### C. The Individual Capacity Claims

¶49   ■   We next turn to the question of whether the members of the Board of Elections were entitled to qualified immunity in their individual capacities for their denial of plaintiffs' rights to Equal Protection.

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (*citations omitted*).

¶50   In *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Court stated:

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful, but is to say that in light of preexisting law the unlawfulness must be apparent.

*Id.*, 483 U.S. at 640, 107 S.Ct. at 3038-39.

¶51   Here there is no question that the complaint asserted conduct on the part of the Board of Elections that violated plaintiffs' rights to Equal Protection, and that this right

---

[9] The trial court limited its equal protection analysis to the issue of the creation of two classes of challenged voters. We believe equal protection analysis applies to the denial of each of the plaintiffs' fundamental right to vote irrespective of the class they were placed into.

was clearly established at the time of the violation. The Board of Elections' interest in disqualifying voters who are not bona fide residents of Rota was not so compelling as to necessitate the creation of two different classes of challenged voters or employing the means it used to disqualify each individual plaintiff from voting.[10]

¶52    The trial court held that the members of the Board of Elections were entitled to qualified immunity because the process for disqualifying voters was not sufficiently or clearly established at the time the hearings were held. As the trial court framed the issue, it held that,

> [t]he relevant question here is whether a reasonable Board member could have believed that the creation of two classes of challenged voters was lawful in light of clearly established law and the information he possessed at the time the classes were created.

*Charfauros Order*, p. 5, TR p. 40.

¶53    The trial court relied upon the deposition testimony of the Chairman of the Board of Elections and his description of the challenges made by Herman Apatang as being more "specific." In particular, the court concluded that the letter from the Democratic Party of Rota "included addresses to contact the challenged voters to advise them that they needed to appear to defend their voter registrations . . ." *Charfauros Order*, p. 6, TR p. 41. This Court's review of the letter written to the Board of Elections reveals that this was not the case. We do not believe that the challenges lodged by the Democratic Party of Rota were any more specific than a simple list of names. There was no information in that letter that either substantiated a claim of non-residence, or provided anything like an "address."

¶54    The trial court also relied upon Commonwealth regulation promulgated by the Board of Elections in 1979 and case law rendered by this court in 1991 to conclude that,

> [The] regulations and case law indicate that the procedure for resolving voter challenges was not "clearly established" at the time that the Board attempted to resolve the November 4, 1995 Rota

election challenges. Under the outdated and unrevised Election Rules and Regulations that the Board relied upon, the reasonable Board member could have believed that the creation of two classes of challenged voters was reasonable. Accordingly, the Court finds that the defendants are entitled to qualified immunity and shielded from liability from civil damages insofar as their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Charfauros Order*, p. 7, TR p. 42.

¶55    This Court cannot agree. The Board of Elections has had notice since 1991 and the case *King v. Board of Elections*, 2 N.M.I. 398 (1991), of the need to study and modify Commonwealth election law. This issue was revisited in *Mendiola v. Taimanao*, Civil Action No. 94-0024, 94-0025 (NMI Super. Ct. Feb. 9, 1994), *writ denied sub nom, Taimanao v. Superior Court*, 4 N.M.I. 94 (1994), *writ denied sub nom, Board of Elections v. Superior Court*, 4 N.M.I. 111 (1994). Once again the Board of Elections was put on notice of the inadequacy of the administrative regulations concerning elections. *See Charfauros Order*, p. 6, TR p. 41. Not only was the right of voters to Equal Protection clearly established at the time plaintiffs' eligibility was denied, the Board of Elections had specific notice of its duty to revise voter challenge procedures. This Court concludes that the impropriety of the Board's actions must have been readily apparent to any reasonable member.

¶56    ▮▮ The Chairman of the Board of Elections testified that he had reviewed Commonwealth election laws a "long, long time ago," and that he really was not currently familiar with the law. Deposition of Miguel M. Sablan, p. 53, ER 71. We find this admission of unfamiliarity with the law disturbing.

> Government officers and officials have a duty not only to know the law in the area in which they work, but to take reasonable steps to ascertain whether their actions are lawful, and not simply rely on her own idea of what the law might be.

Avery, Rudovsky and Blum, POLICE MISCONDUCT: LAW AND LITIGATION, 3d Ed. § 3:9 at page 3-30.4, *discussing* qualified immunity generally. *See also, Harlow v. Fitzgerald*, 457 U.S. at 819-20, 102 S.Ct. at 2738 ("A reasonably competent public official should know the law governing his conduct."); *Salahuddin v. Coughlin*, 781 F.2d 24, 27 (2d Cir. 1986) ("Officials are held to have constructive notice of established law.").

¶57    If voter disqualification challenges were more "specific" in a truly meaningful sense, a classification system that created two classes of challenged voters might

---

[10]    [T]he Supreme Court has required that judges exercise independent judicial review when examining classifications that allocate voting rights. It is important that the judiciary not simply defer to legislative decisions in this area but, instead, insure that voting classifications promote important societal interests and are not simply attempts by persons in power to impair or dilute the right to vote of disfavored classes.

TREATISE ON CONSTITUTIONAL LAW, *supra*, at p. 392.

have survived constitutional challenge. For instance, if the challenges were made by sworn statement under penalty of perjury, or if supporting documents were attached demonstrating a prima facie case of a person's residence in another jurisdiction (i.e., a voter registration card from another jurisdiction). But even documentary evidence must be narrowly construed. For example, a driver's license, rental agreement, paycheck, or utility bill from another jurisdiction all fail to set forth a prima facie case that the person to whom they belong is not a resident, and therefore not qualified to vote in Commonwealth election.

¶58 ▆ We hold there was neither a compelling nor a rational basis for separating the challenged voters in this case into two classes. The decision to rush these hearings on such little notice, with such little time before the election, with no opportunity for appeal, upon such weak evidence was inept. To describe this process as merely negligent is too generous. It was, in the words of the trial court in *Taitano v. Mundo*, "egregious."

We find it quite disturbing that members of the Board of Elections felt free to proceed to disqualify voters using procedures that had not been published, had not been subject to public comment, were clearly inadequate, and quite apparently were not informed by legal research or analysis. It is only apparent that Equal Protection is the norm under the law, and that any deviation is suspect. "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate . . ." *Harlow v. Fitzgerald*, 457 U.S. at 8199, 102 S.Ct. at 2739. We believe an objectively reasonable member of the Board of Elections would begin with an assumption of equal protection in mind and proceed to deviate from that assumption with extreme caution. That was clearly not the case here.

¶59 Furthermore, the actual conduct of the challenge hearings should have put any objectively reasonable member of the Board of Elections on unmistakable notice that registered voters were being challenged on the basis of woefully inadequate evidence. The willingness of the members of the Board of Elections to rely on such evidence demonstrates that they were heedless of plaintiffs' fundamental right to vote. In view of all these surrounding circumstances we cannot conclude that the members of the Board can be said to have acted in reasonable fashion viewed from an objective standpoint. For these reasons, we do not believe that members of the Board of Elections were entitled to qualified immunity.

## VIII.

### The Claims for Intentional Infliction of Emotional Distress

¶60 ▆ The common-law tort of intentional infliction of emotional distress is a limited cause of action. It is not available to anyone who feels emotionally disturbed by the acts of others. Rather, it is limited to those instances where the act complained of is outrageous, and the emotional distress suffered is severe. Two of the plaintiffs here did not meet their burden of proof necessary to withstand a defense motion for summary judgment on the issue of whether the injuries asserted were severe.

### A. Standards Generally for Intentional Infliction of Emotional Distress Claims

¶61 ▆ In our Commonwealth the common law is drawn from the RESTATEMENTS. 7 CMC § 3401; *Castro v. Hotel Nikko Saipan*, 4 N.M.I. 268, 272, n. 5 (1995) ("In the absence of contrary statutory or customary law this Court applies the common law as expressed in the RESTATEMENTS."[11]), *appeal dismissed*, 96 F.3d 1259 (9th Cir. 1996). The action asserted by plaintiffs is defined in the RESTATEMENT (SECOND) OF TORTS § 46 (1965) (hereinafter RESTATEMENT) as "Outrageous Conduct Causing Severe Emotional Distress," and is, in relevant part, as follows:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it for such bodily harm.

*Id.*

¶62 To maintain a cause of action for the intentional infliction of emotional distress requires proof of four elements: (1) that the conduct complained of was outrageous; (2) that the conduct was intentional or reckless;[12] (3) it must cause emotional distress; and (4) the distress must be severe. *See, Arriola v. Insurance Company of North America*, 2 CR 113, 121 (Trial. Ct. 1985), *citing Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 at 1273 (10th Cir. 1979).

¶63 ▆ Comment h. to RESTATEMENT § 46 sets forth an important duty of courts to guard the gateway to the cause of action for intentional infliction of emotional distress.

---

[11] There are no statutory provisions addressing intentional infliction of emotional distress. No one suggests that customary law within the Commonwealth alters or should alter the common law with respect to the tort of intentional infliction of emotional distress.

[12] Appellee's Brief to this Court omitted the word "reckless" from within its quote from this case. *See* Appellee's Brief, p. 6. The facts of this case appear to support *at least* an inference of recklessness on the part of the members of the Board of Elections.

The reasons for this appear from the history of this cause of action and the justifiable reluctance of courts of law to become embroiled in petty disputes that nonetheless cause someone to feel emotionally disturbed and distressed.[13] Accordingly, comment h. requires the court to judge the sufficiency of the conduct alleged to have caused the emotional distress before allowing the case to proceed to a full trial:

> It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery ..

RESTATEMENT § 46 com. h.

¶64 It is well established that before a claim for the intentional infliction of emotional distress raises a question of fact requiring resolution by trial, the plaintiff must set forth facts establishing the outrageousness of the conduct as a matter of law:

> If courts do not in clear cases exercise their review of such claims in the first instance, the standards of outrageousness will be expanded into an unreviewable jury question, diluting the importance of the cause of action and the available relief.

*Keiter v. Penn Mutual Ins. Co.*, 900 F.Supp. 1339, 1348 (D. Haw. 1995).

¶65 In light of this gatekeeping function, Comment c. to RESTATEMENT § 46 reminds courts, however, that "[t]he law is still in a stage of development, and the ultimate limits of this tort are not yet determined." *Id.* The cause of action is thus "fully open to the possibility of further development of the law, and the recognition of other situations in which liability might be imposed." *Id.*

¶66 Comment h. to RESTATEMENT § 46 goes on to further delineate the gatekeeping function:

> Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and

outrageous to result in liability.

*Id.*

## B. Application to the Facts of this Case

¶67 This Court is prepared to find that the acts of the Commonwealth Board of Elections against plaintiffs might be found "extreme and outrageous" within the meaning of RESTATEMENT § 46, particularly in light of comment c., above.

¶68 Comment d. to § 46 states that "[t]he cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous." Comment d. goes on to say,

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized society. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Id.*

¶69 This rather restrictive language of comment d., above, is modified by the language of comment e. to RESTATEMENT § 46. Comment e. indicates that the nature of the relation between the parties must be factored into the judgment whether the conduct was outrageous as a matter of law:

> The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or a power to affect his interests.

*Id.* This comment has particular relevance to actors who are government officials, or who otherwise occupy positions of authority.[14]

¶70 ■ Here, the members of the Board of Elections had the position, power and authority to affect plaintiffs' right

---

[13] Comment b. to RESTATEMENT § 46 sets forth some of these considerations:

> Because of the fear of fictitious or trivial claims, distrust of the proof offered, and the difficulty of setting up any satisfactory boundaries to liability, the law has been slow to afford independent protection to the interest in freedom from emotional distress standing alone.

*Id.*

[14] The cause of action here is against the individual members of the Board of Elections acting in their individual capacities for violation of constitutionally protected rights. No claims are before us in common law tort against the government. The Government Liability Act, 7 CMC §§ 2201 et seq., which applies only to common law tort actions (as distinct from so-called "constitutional torts") against the government and its employees is, therefore, inapplicable.

to vote. The means by which plaintiffs were deprived of that right were "egregious," in the words of the trial court, and deliberately indifferent to plaintiffs' rights, in our view. Where government officials, with deliberate indifference, recklessly disregard and violate fundamental rights, the circumstances surrounding such conduct may be found outrageous. We believe the evidence was sufficient to withstand summary judgment on the issue whether the members of the Board abused their positions, power and authority to such a degree that an average member of this Commonwealth could find their conduct outrageous. Thus questions of material fact arose precluding summary judgment. Com. R. Civ. P. 56.

### C. Compensable Injuries in Claims for Intentional Infliction of Emotional Distress

¶71    Finding that the acts of the members of the Board of Elections satisfied the first two elements of the cause of action does not end the inquiry. Plaintiff must still demonstrate that the injuries suffered as a result of such conduct are of the kind compensable and caused severe emotional distress.

¶72    Comment d. to RESTATEMENT § 46 introduces the level of harm necessary to maintain a claim for the intentional infliction of emotional distress:

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. *There is no occasion for the law to intervene in every case where someone's feelings are hurt.*

*Id., (Italics supplied).*

¶73    Comment j. to RESTATEMENT § 46 is more specific. To maintain a cause of action, plaintiffs must demonstrate their injuries were severe and were of the kind compensable within this cause of action.

> The rule stated in this Section applies only where the emotional distress has in fact resulted and where it is severe. Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. . . .

> *The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.*

*Id., (Italics supplied).*

█ The court plays another important gatekeeping role with respect to this element of the cause of action. Just as in the case of the first element - whether the defendant's conduct reached the level of outrageousness that the law will recognize a cause of action at all - the court is called upon to determine whether the injuries allegedly suffered by plaintiff are sufficient as a matter of law.

> It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.

RESTATEMENT § 46 com. j.

¶74    We hold two plaintiffs did not meet their burden of proving severe emotional distress of a kind compensable through this cause of action.

¶75    █ Plaintiff Charfauros described the impact of the decision to deny him the right to vote in terms of impact on his business interests and the invasion upon his privacy. ER p.47-48. He indicated he "worried" about the impact of the disclosure of his party affiliation upon his business. He thus did not allege injuries of the type described in comment j, *supra*. Injuries to one's business are not compensable through an action for the intentional infliction of emotional distress. Furthermore, the fact that one must institute legal process to enforce their rights or secure their interests does not, standing alone, state a claim for the intentional infliction of emotional distress. *Arriola*, 2 CR at 123-124.

¶76    During his deposition, plaintiff John Andrew Atalig flatly denied that the decisions of the Board of Elections had any impact on his relationships, ER p. 23, and otherwise did not set forth any facts supporting a finding that he suffered from severe emotional distress. He testified that he had difficulty finding a job as a result of the actions of the Board, but that, again, is not the kind of injury compensable through an action for the intentional infliction of emotional distress.

¶77    In their opposition to defendants' motion for summary judgment, and in their reply to defendants' opposition to plaintiffs' motion for partial summary judgment, plaintiffs focused their attention on facts supporting a claims for the intentional infliction of emotional distress on the part of plaintiff Maria Toves Aldan.

¶78    █ Plaintiff Maria Toves Aldan testified that the whole matter caused her "stress and pain" and that her life in Rota became "unbearable." ER p. 61. This deposition testimony alleges injury that is compensable through an

203

action for intentional infliction of emotional distress. It further alleges injury that was severe within the terms of the cause of action.

¶79 It is important to note that the need to assert one's rights as against another does not *ipso facto* give rise to a cause of action for the intentional infliction of emotional distress. Society expects its community members to withstand some strain and pressure necessarily inherent in asserting their legal rights without automatically leading to a claim for emotional distress. *Arriola, supra.*

¶80 We find that the evidence produced at summary judgment was sufficient to withstand summary judgment as against plaintiff Maria Toves Aldan. There was no evidence supporting the claims made on behalf of plaintiffs Charfauros or Atalig. The grant of summary judgment against plaintiffs Charfauros and Atalig is therefore affirmed, and the grant of summary judgment against plaintiff Aldan is reversed.

## IX. Claims for Violation of the First Amendment

¶81 ▮ Finally, we uphold the trial Court's grant of summary judgment on claims stated by plaintiffs that their First Amendment rights to free association were violated by the actions of the Board of Elections.

¶82 We agree with the trial court that the record is insufficient to support a claim for violation of the plaintiffs' First Amendment rights to association. The proof required, but not provided, was that all persons challenged by the Democratic Party were members of the Republican Party. It might be presumed that the Democratic Party would only challenge Republican Party member's right to vote, but this would presume too much. On summary judgment plaintiffs had the duty to present evidence in support of that claim. While allegations in the complaint must be taken as true, the complaint did not allege that all the people challenged by the Democratic Party were Republican Party members. It is possible, and indeed likely, that the leadership of a political party could challenge the residency of a registered voter without knowing or caring whether such person was a member of another party, or an independent voter without party affiliation. The challenges made by the Democratic Party did not inexorably and necessarily imply that every person challenged was associated, or intended to associate with the Republican Party. Accordingly, we sustain the Superior Court's grant of summary judgment on plaintiffs' claims of violation of the First Amendment.

## X.

## Conclusion

¶83 The order granting summary judgment to defendants is reversed in part and affirmed in part.[15] The finding that the members of the Board of Elections, acting in their individual capacities, were entitled to qualified immunity, and therefore entitled to summary judgment is reversed. The dismissal of plaintiff Charfauros' and Atalig's claims for intentional infliction of emotional distress is affirmed. The dismissal of plaintiff Aldan's claims for intentional infliction of emotional distress is reversed. The dismissal of all plaintiffs' claims for First Amendment violations is affirmed.

¶84 The remainder of this case is remanded to the Superior Court for further proceedings consistent with this opinion.

---

**ATALIG, Justice Pro Tem:**

¶85 I concur in part and dissent in part. I concur with the majority's opinion in affirming the Superior Court's decision to dismiss the claims for intentional infliction of emotional distress by Charfauros and Atalig and in its dismissal of all plaintiff's claims for First Amendment Violations.

¶86 However, I dissent in the Majority's opinion that the members of the board of elections acting in their individual capacity were not entitled to qualified immunity. I also disagree in the findings that Aldan's claim for intentional infliction of emotional distress was valid.

The trial court's decision was well grounded and should be affirmed on all grounds.

---

**MACK, Special Judge, concurring:**

¶87 I concur in the opinion of Special Judge Wiseman. I write separately to emphasize the reasons for my concurrence.

¶88 **Equal Protection.** Plaintiffs-appellants bring a claim for violation of their constitutional equal protection rights for defendants' unlawful denial of their right to vote. The Superior Court has previously determined that their right to vote was wrongfully denied. *Taitano v. Mundo,* Civil Action No. 95-1082(B) (NMI Super. Ct. April 11, 1996).

¶89 The members of the Board of Elections cannot discriminate in the election process. In the instant case, the record disclosed facts of differential treatment of challenges made by Republicans from those made by Democrats, with the differential treatment justified by only a pretext.

¶90 Fundamental rights, such as voting are entitled to strong protection. There have been numerous challenges in the CNMI throughout the years to voter eligibility and

---

[15] Plaintiffs did not appeal the denial of their motion for partial summary judgment.

election results based on voter eligibility. The Court has previously criticized the procedures used by the Board of Elections in handling voter challenges, but has allowed prior procedures to stand as long as they met minimal due process standards. The Court has also allowed the Board ample time to promulgate and adopt better procedures for voter challenges.

¶91 The Board of Elections, however, has not taken the opportunities afforded from all prior litigation over the past decade to publish draft regulations, hold hearings, solicit comments, follow sound legal advice, or promulgate official regulations, satisfying due process and equal protection for handling challenges to voter's eligibility. The Board knew of the problems and didn't adopt constitutionally firm regulations.

¶92 In the instant case the Board devised, and at the last minute, applied an unpublished, ad hoc new procedure. The procedure that was concocted patently treated challenges by the Republican Party differently than those by the Democratic Party. The manner of giving notice of the challenge "hearings" and the hearing "decisions" that persons could not vote, the abrupt "reversal" that they could cast a vote subject to later adjudication and the notice of such reversal after the election occurred was inept and inexcusable.

¶93 The Superior Court erred in finding that the members of the Board of Elections are protected by qualified immunity, which requires that they neither knew nor should have known of the constitutional problems with their action. They knew they were guessing about what to do, guessing without having familiarized themselves with the law on the subject, and guessing without having taken steps necessary to have in place constitutionally firm regulations on how to handle voter challenges. They also knew or should have known that denial of the vote to qualified citizens is a denial of equal protection of the laws.

¶94 There is no allegation that the Board members harbored personal malice toward the voters whose qualifications they rejected. Such malice is not required. The Board members were sufficiently derelict in their duties that a claim for their personal liability may go forward.

¶95 **Intentional Infliction of Emotional Distress.** Each plaintiff suffered from the same intentional denial of their rights to vote. Being individuals, however, they did not suffer in the same way. The claim for violation of their constitutional rights is aimed at protecting their rights and the focus is on the actions that violated those rights; the claim for intentional infliction of emotional distress is aimed at allowing recovery for damages suffered and much of the focus is on the effect and impact suffered.

¶96 The suffering of plaintiff-appellant Aldan meets the threshold test of severity so that the claim can be adjudicated at trial. The others, who also suffered, were

perhaps more resilient and the evidence presented did not meet the threshold level of severity needed to go forward on their claim.